UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

JEFFREY W. MILLER,

               Plaintiff,

     -against-

MERCURIA ENERGY TRADING, INC.,
MERCURIA ENERGY ASSET
MANAGEMENT, BV, MERCURIA
CAPITAL PARTNERS LTD., MERCURIA
US ASSET HOLDINGS, LLC, UPSTREAM
LATINOAMERICA, S.L., and PHOENIX
GLOBAL RESOURCES PLC (f/k/a ANDES
ENERGIA PLC),

               Defendants.

------------------------------------------------------x

2017 Civ. _____

**COMPLAINT**

**TRIAL BY JURY DEMANDED**

Plaintiff Jeffrey W. Miller, by and through his attorneys Baker Hostetler LLP, as and for

his complaint against defendants Mercuria Energy Trading, Inc., Mercuria Energy Asset

Management, BV, Mercuria Capital Partners Ltd., Mercuria US Asset Holdings, LLC, Upstream

Latinoamerica, S.L., and Phoenix Global Resources plc alleges:

    1.     Plaintiff Jeffrey W. Miller is an investment professional who sourced, procured

and managed a lucrative oil field investment in Argentina for Mercuria Energy Group Limited

and its affiliates ("Mercuria"). The investment was known as Glacco. Mr. Miller served as

Director and President of Glacco Compania Petrolera S.A. ("Glacco") and numerous other

Mercuria-related entities.

    2.     In connection with his Mercuria employment and in consideration for his

leadership role in initiating, closing and running the Glacco investment, Mr. Miller acquired a

carried interest in Glacco in the form of all of the outstanding 3,200 preferred shares in the

holding company that owned Glacco, Upstream Latinoamerica, S.L. ("ULA"). ULA's Articles of Association provided that Mr. Miller's preferred stock constituted a net liquidation preference of seven percent of ULA's profit exceeding an investment return rate of ten percent.

3.      Mr. Miller left Mercuria in October, 2012. At that time, Mr. Miller was 100 percent vested in the Glacco carried interest. Mercuria had yet to realize a capital event for the Glacco investment. Mr. Miller's continuing carried interest in seven percent of the net profits of ULA was reaffirmed by Mercuria and incorporated into a separation agreement entered into between Mr. Miller and Mercuria. That agreement reaffirmed that upon Mercuria's disposition of the Glacco investment, Mr. Miller's Glacco carried interest entitled him to seven percent of ULA's profit after an investment return rate of ten percent to investors.

4.      Mercuria ultimately benefitted royally on the Glacco investment that Mr. Miller led. Mercuria combined Glacco and another Mercuria Argentinian oil and gas company with Petrolera El Trebol S.A. ("PETSA"), with the Mercuria managers in charge of the combined PETSA entity. That transaction was completed on March 8, 2017. Shortly thereafter, on July 24, 2017, without any prior notice to Mr. Miller even though he was the sole preferred shareholder, Mercuria announced it was closing a transaction that consolidated its oil and gas interests in Argentina, including ULA and PETSA, with Andes Energia PLC, a public company. The combined company was renamed Phoenix Global Resources plc ("Phoenix Global").

5.      Phoenix Global's stock trades on the London Stock Exchange and the Buenos Aires Stock Exchange. Phoenix Global now has an extensive and diversified portfolio of oil and natural gas assets in Argentina. In total, Phoenix Global has 63 million barrels of oil equivalent ("BOE") of proved and probable petroleum reserves, and over 11,500 BOE of daily production, of which the Glacco investment represents approximately 31 percent and 29 percent,

respectively.  Mercuria and its affiliates own approximately 80 percent of Phoenix Global.

Glacco represents 39 percent of the proved and probable reserves that were contributed by

Mercuria and its affiliates and 36 percent of the daily production.

6.    Mr. Miller has been excluded from participating in the Phoenix Global

transaction.  His net liquidation preference has not been paid.  Mercuria has denied Mr. Miller

his net liquidation preference for his Glacco carried interest despite the facts that:

(i)    all of Mercuria's stock holdings in ULA and PETSA have been
contributed to and converted into stock in Phoenix Global;

(ii)    Mr. Miller is ULA's sole preferred shareholder;

(iii)    Mr. Miller has a redemption right under ULA's Articles of Association
and his separation agreement with Mercuria to seven percent of the net
profits upon a liquidation event;

(iv)    Mr. Miller was the architect of the lucrative Glacco investment;

(v)    Glacco has been stripped of all of its assets;

(vi)    ULA preferred stock is worthless if not redeemed, as required, or
converted into Phoenix Global shares; and

(vii)    Mr. Miller was a director of many of the other Mercuria entities that held
oil and gas assets contributed to Phoenix Global.

7.    Mr. Miller has been completely denied his required net liquidation preference and

any participation in Phoenix Global, the successor-in-interest to Mercuria's Argentinian oil and

gas interests, even though all of Mercuria's Argentinian oil and gas interests, including the

entirety of its stock ownership in ULA and PETSA, have all been combined into Phoenix Global,

all of the Glacco oil field assets belong to Phoenix Global, and all of the shares owned by

Mercuria have been converted into Phoenix Global stock.  Nevertheless, Mr. Miller's preferred

shares in ULA stock have neither been redeemed nor converted into Phoenix Global stock.

8. Defendants' actions in denying Mr. Miller his liquidation preference in the Phoenix Global transaction violate ULA's Articles of Association and breach the separation agreement between Mercuria and Mr. Miller. Their treatment of Mr. Miller rides roughshod over his contractual and shareholder rights, is contrary to private equity industry norms, defies any business logic, and is thoroughly unjust and inequitable.

9. Mr. Miller has demanded $32,600,000 plus interest for redemption of his carried interest in Glacco that was due and owing as a result of the combination that created Phoenix Global. His demand was based on his rights as a preferred shareholder under ULA's Articles of Association and on the contractual reaffirmation of those rights Mercuria made to him in exchange for his releasing any other claims against Mercuria when he left its employ.

10. In response to Mr. Miller's demand, Mercuria asserts that Mr. Miller is owed nothing and that his Glacco carried interest has no value or redemption rights even though his carried interest entitled him to participate alongside Mercuria in the disposition of the Glacco investment. Mercuria's response to Mr. Miller's demand leaves him with no choice but to bring this action against the responsible Mercuria entities and against Phoenix Global as successor-in-interest now responsible for Mercuria's Glacco obligations.

## THE PARTIES

11. Plaintiff Jeffrey W. Miller maintains a principal place of business at The Cassidy Building, 407 Throckmorton Street, Suite 560, Fort Worth, TX 76102. Mr. Miller is an investment professional with over thirty years of significant financial, managerial, operational and technical experience in the global oil and gas exploration and production industry. Mr. Miller worked for Mercuria where he held global responsibility for origination, investment

analysis, negotiation of acquisitions and divestments, as well as management of the upstream investment portfolio of Mercuria.

12.     Defendant Mercuria Energy Trading, Inc. ("METI") is a Delaware corporation with its principal place of business at 33 Benedict Place, First Floor, Greenwich, CT 06830. METI is a subsidiary or affiliate of Mercuria Energy Group Limited ("Mercuria EG").

13.     Defendant Mercuria Energy Asset Management, BV ("Mercuria EAM") is a company incorporated in the Netherlands. Mercuria EAM is a subsidiary or affiliate of Mercuria EG.

14.     Defendant Mercuria Capital Partners Ltd. ("Mercuria Capital") is a limited company incorporated in Cyprus with a registered office at Simou Menardou 8, Ria Court 8 – Office 302, 6015 Lanarca, Cyprus. Mercuria Capital is a subsidiary or affiliate of Mercuria EG.

15.     Defendant Mercuria US Asset Holdings, LLC ("Mercuria US Holdings") is a limited liability company incorporated in Delaware. Mercuria US Holdings is a subsidiary or affiliate of Mercuria EG.

16.     Defendant ULA (Upstream Latinoamerica, S.L.) is a Spanish company with a registered office at Calle de Velazquez, 61 -1º Izquierda, Madrid, Spain. Plaintiff Jeffrey W. Miller owns 100 percent of the outstanding preferred stock of ULA. ULA is a holding company that owned all of the stock of Glacco. Prior to August 10, 2017, ULA was a subsidiary or affiliate of Mercuria EG. On August 10, 2017, through a transaction detailed below, Phoenix Global purchased all of the outstanding ordinary stock of ULA.

17.     Defendant Phoenix Global (Phoenix Global Resources plc f/k/a Andes Energia PLC) is a public company incorporated in England and Wales with its principal place of business

at 2nd Floor Berkeley Square House, London, W1J 6BD, United Kingdom. Phoenix Global is the successor-in-interest to ULA.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2) because: (a) the controversy is between citizens of different states and citizens or subjects of foreign states; and (b) the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

19.    This Court has personal jurisdiction over the defendants pursuant to N.Y. C.P.L.R. §301 and §302(a)(1). METI, Mercuria EAM, Mercuria Capital, and Mercuria US Holdings have consented to personal jurisdiction in this Court pursuant to the terms of a Mutual Release and Settlement Agreement with Mr. Miller, dated October 16, 2012 (the "Separation Agreement"). A true and correct copy of the Separation Agreement is annexed hereto and incorporated by reference herein as Exhibits A1 – A3.

20.    Venue in this District is proper pursuant to 28 U.S.C. §1391(b)(3) and the forum selection clause contained within the Separation Agreement.

## FACTUAL ALLEGATIONS

21.    Mercuria is a global energy and commodities trading company established in 2004. It does business in more than 50 countries and maintains 38 offices in 27 countries with over 1000 employees. Mercuria generated approximately $91 billion in gross revenue in 2016. Mercuria's primary business is sourcing, supplying and trading crude oil and refined petroleum products. Mercuria's portfolio also includes petrochemicals, biofuels, environmental products,

natural gas, liquefied natural gas, power, coal, iron ore, base metals and a range of other dry bulk commodities and agricultural products.

22.     On or about June 2008, Mr. Miller began working for Mercuria at its global headquarters in Geneva, Switzerland.  Mercuria hired Mr. Miller to source, develop, and manage certain investment opportunities on behalf of Mercuria.  Subsequently, Mr. Miller moved to Texas and, on or about November 1, 2009, he entered into an employment agreement with Mercuria's U.S. affiliate, METI.

23.     In late 2009, Mr. Miller originated, negotiated, and orchestrated Mercuria's acquisition from Chevron of a lucrative oil and gas investment known as Glacco.

24.     Mr. Miller was instrumental in Mercuria's acquisition of Glacco.  Mr. Miller discovered the Glacco investment through one of his own personal business contacts.  He led the negotiation of the agreement pursuant to which Mercuria acquired Glacco from Chevron.

25.     Through the Glacco acquisition, Mercuria obtained Glacco's significant oil and gas assets throughout two provinces in Argentina.  The acquisition of Glacco added substantial oil and gas interests, both in terms of existing production and exploration, to Mercuria's already existing oil and gas portfolio in Argentina.

26.     Mercuria lacked the necessary operational capabilities to operate the newly acquired Glacco oil and gas assets.  Consequently, simultaneously with the Glacco acquisition, Mr. Miller was also responsible for negotiating an operating agreement with Roch S.A. ("Roch") to operate Glacco's oil and gas assets in Argentina.

27.     Mr. Miller remained significantly involved with Glacco's governance and operations.  Mr. Miller served as Glacco's Director and President.  He likewise served as

Director and/or Officer of at least twenty other Mercuria-related entities. Mr. Miller traveled to Argentina frequently in connection with his Glacco managerial duties.

28.     On March 12, 2010, in consideration for Mr. Miller's efforts in sourcing, negotiating, and acquiring Glacco, ULA's sole director and founder of Mercuria Guillaume Vermersch, sold to Mr. Miller for a nominal fee a carried interest consisting of all the preferred stock in Glacco's parent company, ULA (the "JWM Glacco Carried Interest"). Mercuria created ULA for the sole purpose of serving as Glacco's holding company.

29.     Both Mercuria and Mr. Miller anticipated that Mercuria's oil and gas interests in Argentina, including those of the newly acquired Glacco entity held by ULA, would be sold or merged with another entity in the future as part of an additional and larger investment. Accordingly, the JWM Glacco Carried Interest had redemption rights to provide that Mr. Miller's carried interest would be treated in like-kind to Mercuria's interests in Glacco upon a capital event. In this manner, as is customary in the private equity business, Mercuria's interests and Mr. Miller's interests were aligned, and he was incentivized to maximize Mercuria's Glacco-related profits upon an exit event from the investment.

30.     Pursuant to ULA's Articles of Association, as amended on December 11, 2009 and May 12, 2017 (the "Articles of Association"), ULA's total share capital was 12,000,000. ULA's stock was separated into two classes: 3,200 Class A preferred shares and 11,996,800 Class B ordinary shares. A true and correct copy of ULA's Articles of Association and a certified translation are annexed hereto and incorporated by reference herein as Exhibits B1 – B4.

31.     ULA's sole director is Guillaume Vermersch. Vermersch is a founding member of Mercuria. Since 2004, he has served as Group Board member of Mercuria EG and has been

the Group Chief Financial Officer of Mercuria EG and Mercuria Energy Trading, which is a subsidiary of Mercuria EG.  Vermersch serves as director of or is otherwise affiliated with at least twenty other Mercuria entities.

32.    On March 12, 2010, ULA's sole director, Vermersch, conveyed all 3,200 ULA Class A preferred shares to Mr. Miller.  The transaction was effectuated pursuant to a Share Purchase Agreement signed by Vermersch.  A true and correct copy of the Share Purchase Agreement is annexed hereto and incorporated by reference herein as Exhibit C.  The balance of the share capital, consisting of 7,996,800 ordinary Class B shares, was owned by Mercuria EAM. (*See* Exhibit A1 at 9).

33.    As ULA's Class A preferred shareholder, Mr. Miller had no right to dividends. His 3,200 preferred shares had one vote per share.  The Class B shareholders had dividend rights and each of the 7,996,800 Class B shares had 100 votes.

34.    Mr. Miller's preferred shares entitled him to only a preferred liquidation quota defined in Article 4 ter. of ULA's Articles of Association as follows:

> [I]n the event of the voluntary or compulsory dissolution or liquidation of the Company, the shares in Class A (Preferred) grant their holders the right to receive a preferred liquidation quota from the corporate assets, whether they be capital or reserves, equal to a seven percent (7%) of the operating profit of the Company, exceeding a return of investment return rate of ten percent (10%).

35.    Article 14 of ULA's Articles of Association addresses dissolution events that would trigger the preferred liquidation quota:

> The Company will be dissolved . . . in the case that the Company assets directly or indirectly consist of shares in the capital of another operating company or companies, when (i) the Company proceeds to transfer all of its share capital or the majority of the control of the company or operating companies owned directly or indirectly by the Company to any third party, whether by sale, non-monetary contribution, structural modification or admission to list on a secondary official market; or (ii) such operating company or

companies owned directly or indirectly by the Company proceed to transfer all or the majority of the assets resulting from its activities.

**The Separation Agreement**

36.     Mr. Miller resigned from Mercuria in October 2012.  He and Mercuria entered into the Separation Agreement on October 16, 2012.  (Exhibits A1 – A3).  The Separation Agreement was drafted by Mercuria.

37.     The Separation Agreement was signed by each of METI, Mercuria EAM, Mercuria Capital and Mercuria US Holdings.   All of those defendants were parties bound by the Separation Agreement.

38.     The Separation Agreement memorialized and reaffirmed the terms and conditions governing various carried interests Mr. Miller had obtained in the course of his Mercuria employment, including the JWM Glacco Carried Interest.  Section V(A) of the Separation Agreement addresses the JWM Glacco Carried Interest.  It describes the background of the JWM Glacco Carried Interest and incorporates the same terms as set forth in ULA's Articles of Association:

> In consideration for having assisted Mercuria in the negotiation of an investment opportunity in Argentina, specifically Glacco Compania Petrolera SA ("Glacco"), you currently hold 3,200 Class A Preferred Shares (the "Preferred Shares") in Upstream Latinoamerica SLU ("ULA"), the parent company of Glacco, which pursuant to the terms of ULA's Articles of Association grant you, in certain predetermined scenarios, the right to receive a preferred liquidation quota equal to seven percent (7%) of the operating profit of ULA exceeding an investment rate of return of ten percent (10%).

39.     Section V(A) of the Separation Agreement further states that the JWM Carried Interest remains subject always to ULA's Articles of Association:

> As holder of the Preferred Shares, you have a predetermined right if ULA and Glacco undergo certain reorganizations or structural modifications pursuant to the laws of Spain.  More broadly, the rights (subject always to the terms of ULA's Articles of Association)

detailed in the preceding two sentences are to be referred to as the "JWM Glacco Carried Interest."

40.     Mercuria and Mr. Miller had a business strategy to seek the sale or merger of Mercuria's oil and gas interests in Argentina, including those held by Glacco, with another entity as a future means to monetize the investment. Prior to leaving Mercuria, Mr. Miller had explored potential mergers with several entities. The Separation Agreement identified a potential and hypothetical transaction with Roch, which operates Mercuria's oil and gas assets, and illustrated potential, hypothetical transactions with Roch that the parties agreed would trigger the JWM Glacco Carried Interest. Nothing contained in the Separation Agreement imposed any manner of limitation on the definition of a preferred liquidation event to the hypothetical Roch transaction. Indeed, the JWM Glacco Carried Interest section of the Separation Agreement, in Section V(A), expressly provided that Mr. Miller's preferred shares were to remain "subject always to the terms of ULA's Articles of Association."

41.     Section V(A) of the Separation Agreement included in its illustration a non-monetary contribution of shares that would constitute a preferred liquidation event. This was a hypothetical or potential transaction in which Mercuria would merge its Argentinian oil and gas interests, including Glacco/ULA, with Roch into a completely new entity. The new entity would then be held by a holding company "outside of the jurisdiction of Argentina." The Separation Agreement further contemplated that the holding company "may be taken public through an initial public offering" or "a reverse merger with a listed entity (the 'IPO Event')." Mercuria and Mr. Miller recognized in Section V(B) of the Separation Agreement that this sort of capital event involving Glacco and Mercuria's other Argentinian oil and gas interests would trigger a preferred liquidation event pursuant to the terms of ULA's Articles of Association.

42.    The Separation Agreement also included agreed-on terms and conditions for

valuing Mr. Miller's preferred shares in ULA in the event of such a reverse merger triggering

Mr. Miller's preferred liquidation rights.  Section V(B) of the Separation Agreement states:

> You [Mr. Miller] and Mercuria wish to agree to the formula based
> on which the preferred liquidation quota that your Preferred Shares
> grant you ought to be valued in accordance with the occurrence of
> either one of the Redemption Events (as defined below).

43.    Mercuria and Mr. Miller agreed in the Separation Agreement that the percentage

of oil and gas assets contributed by Glacco to Mercuria's total oil and gas assets in Argentina

was 42 percent.  Using a potential Roch transaction as an illustration, Section V(B)(i) of the

Separation Agreement states:

> [T]he value of the contribution of Glacco to the Mercuria/Roch
> NEWCO [the new entity to be formed by Mercuria and Roch] will
> be considered to be equal in value to forty-two percent (42%) of the
> total value of all assets being contributed by Mercuria to the
> Mercuria/Roch NEWCO (such percentage is hereinafter referred to
> as the 'Glacco Investment Percentage').

> You [Mr. Miller] and Mercuria recognize that the Glacco
> Investment Percentage is a value agreed to by you and Mercuria for
> purposes of this Settlement Agreement in advance of the
> Merger...subject to adjustment (whether up or down) on the date of
> the Merger based upon the value of Pre-Merger Indebtedness.

44.    The Separation Agreement makes clear that the 42 percent Glacco Investment

Percentage reflects the amount of Mercuria's total Argentinian oil and gas assets comprised of

the Glacco investment assets prior to any transaction.  This agreed-on percentage was a function

of Mercuria's total oil and gas holdings in Argentina at the time of the Separation Agreement,

exclusive of the oil and gas assets of any entity that would become a possible merger partner, and

fully aligned Mr. Miller with Mercuria.

45.    Section V(B)(iii) of the Separation Agreement recognizes that a reverse merger

involving a holding company (in which Glacco is held) with a publicly listed entity, defined as

an IPO Event under the Separation Agreement, constitutes a redemption event for purposes of the JWM Glacco Carried Interest. The Separation Agreement states, in pertinent part:

> For purposes of the redemption rights set forth in this Section V, an IPO Event shall be deemed to also include the completion (in all legal respects) of a reverse merger by HoldCo through which HoldCo acquires all of the outstanding and issued shares of an already existing public company pursuant to a fully negotiated and executed purchase and sale agreement with such public company and ancillary documents thereto.

46.     The Separation Agreement further recognizes Mr. Miller's right to "fully redeem" the JWM Glacco Carried Interest when there is a redemption event, and it memorializes Mercuria's obligations owed to Mr. Miller upon such an event. Section V(B)(v) reads:

> [Y]ou [Mr. Miller] will be entitled to fully redeem your existing Preferred Shares (subject to fulfillment of all legal and statutory requirements under the laws of Spain or any other relevant jurisdiction) with no cash payment or other consideration whatsoever being owed to you.
>
> (a) If the Redemption Event is an IPO Event, within a reasonable timeframe prior to any such IPO Event being completed and in full and final, unconditional and irrevocable, exchange and discharge for and of the JWM Glacco Carried Interest (as valued on that day), you will be issued shares in the HoldCo.
>
> * * *
>
> The shares to be issued to you in the Holdco shall be equivalent to the economic value of the JWM Glacco Carried Interest determined based upon the following formula.

47.     In Section V of the Separation Agreement, the parties expressly acknowledged that the formulas and calculations governing the redemption of the JWM Glacco Carried Interest were illustrative hypotheticals:

> Numerical examples of the provisions of this Section (B)(v) are set forth in Exhibit F attached hereto and incorporated herein for illustration purposes only and are not intended to establish any particular values or rights between each of you and Mercuria.

48.    Nothing in the Separation Agreement limits Mr. Miller's preferred liquidation rights under the ULA Articles of Association to the Roch example set forth in Section V, or any other limitation. As written in Section V(b)(vi) of the Separation Agreement:

> Governance of Preferred Shares. It is hereby expressly understood and agreed that your Preferred Shares and statutory rights in ULA (or its successor entity) shall at all times continue to be governed by and construed, as applicable, in accordance with ULA's Articles of Association (or, as applicable, the governing documents of any successor entity) and the laws of Spain or the relevant jurisdiction;

> * * *

> Nothing in this Settlement Agreement or specifically the provisions set forth in this Section V shall be interpreted or construed to override or otherwise conflict with any of the terms and conditions of ULA's Articles of Association.... To the extent of any such conflict, you and Mercuria [EAM] agree that the terms and conditions of ULA's Articles of Association...and/or the laws of Spain or the relevant jurisdiction...shall prevail over this Settlement Agreement.

**The Phoenix Global Transaction**

49.    On July 24, 2017, Mercuria announced it was merging all of its Argentinian oil and gas assets with Andes Energia PLC ("Andes Energia"), a publicly listed company with its own oil and gas assets in Argentina. Andes Energia was to be renamed Phoenix Global with an IPO Event on the London and Buenos Aires stock exchanges. Mercuria did not provide Mr. Miller with any prior notice of the transaction or any rights in the transaction, even though he was ULA's sole preferred shareholder with the right to participate in like-kind with ULA/Glacco in such a redemption event.

50.    The consolidation transaction that resulted in Phoenix Global involved a non-monetary contribution of ULA's shares in a reverse merger/IPO Event as Mercuria and Mr. Miller had anticipated and described in Section V of the Separation Agreement and as ULA had anticipated as a redemption event in its Articles of Association.

51.     This occurred through a combination of Andes Energia and Trefoil Holdings B.V. ("Trefoil"). Trefoil was a holding company created by Mercuria. It indirectly owned, through several of its subsidiaries, including ULA, 99.99 percent of the shares of PETSA, the operating company for the Argentinian oil and gas exploration and production business of Mercuria, including Glacco. Upon completion of this merger, the combined entity was renamed, rebranded and publicly-traded as Phoenix Global Resources plc. (The overall transaction combining Andes Energia and Trefoil and listing the shares of the combined company as the publicly-traded entity Phoenix Global is referred to hereafter as the "Phoenix Transaction").

52.     The prospectus for the Phoenix Transaction, dated July 24, 2017 (the "Prospectus"), described the Phoenix Transaction as a reverse merger that converted Mercuria's Argentinian oil and gas holdings, including ULA and PETSA, into shares of Phoenix Global. Phoenix Global is a public company now listed on the London Stock Exchange and the Buenos Aires Stock Exchange. A true and correct copy of the Prospectus is annexed hereto and incorporated by reference herein as Exhibit D.

53.     Details of the Phoenix Transaction are disclosed in an Admission Document issued by Andes Energia, pursuant to AIM Rules of Companies enacted by the London Stock Exchange (the "Admission Document"). A true and correct copy of the Admission Document is annexed hereto and incorporated by reference herein as Exhibits E1 – E14.

54.     The Admission Document details how leading up to the Phoenix Transaction Mercuria reorganized and modified the structure of several of its holding companies and subsidiaries to facilitate the reverse merger. As Mercuria and Mr. Miller had contemplated in Section V of the Separation Agreement, the Admission Document sets forth that Mercuria created a holding company outside of Argentinian jurisdiction—namely, Trefoil—to house the

Mercuria subsidiaries that owned all of Mercuria's oil and gas assets in Argentina prior to the reverse merger. Mercuria then transferred ownership and control of all of its Argentinian oil and gas subsidiaries, including ULA and PETSA, to Trefoil.

55.    Specifically, as set forth in the Admission Document, on June 26, 2017, Mercuria EAM and Trefoil entered into a share purchase agreement (the "Trefoil/ULA Share Purchase"), pursuant to which Mercuria agreed to sell the entirety of its share holdings in ULA to Trefoil. (Exhibit E14 at 515). The Admission Document recites that 99.96 percent of the outstanding stock of ULA and 99.99 percent of the stock of PETSA was converted into Phoenix Global stock. On information and belief, the 0.04 percent of ULA stock excluded from this non-monetary contribution and share exchange was comprised of Mr. Miller's 3,200 preferred shares.

56.    The Phoenix Transaction was the redemption event that Mercuria and Mr. Miller had anticipated in their business planning and the Separation Agreement liquidating the Glacco investment and monetizing Mercuria's Argentinian oil and gas interests. The Trefoil/ULA Share Purchase constituted a dissolution of ULA under the terms of Article 14 of ULA's Articles of Association. The totality of Mercuria's ordinary share capital in ULA was contributed to and exchanged for Phoenix Global stock. Only Mr. Miller's 3,200 preferred shares were excluded, in derogation of his rights. Likewise, PETSA – including all of the assets and control of Glacco, directly or indirectly controlled by ULA – was also contributed to Trefoil and exchanged for Phoenix Global stock. The oil and gas assets of Glacco were likewise transferred and their activity now accrues to the benefit of Phoenix Global. Glacco has been stripped of all of its assets. ULA's only asset was stock ownership of Glacco.

57.    The Phoenix Transaction was completed on August 10, 2017. A true and correct copy of the August 10, 2017 Announcement regarding the completion of combination with

PETSA and first day of dealings of Enlarged Share Capital is annexed hereto and incorporated by reference herein as Exhibit F.  Through the Phoenix Transaction, Andes Energia acquired the entire issued share capital of Trefoil.  At the same time, Upstream Capital Partners VI Limited ("Upstream Capital"), a subsidiary of Mercuria EG, received 1,899,106,385 shares of Phoenix Global.  In addition, Mercuria EAM received 14,766,666 shares of Phoenix Global.  A true and correct copy of the August 15, 2017 Notification of Major Holdings is annexed hereto and incorporated by reference herein as Exhibit G.

58.     In total, as a result of the Phoenix Transaction, when it closed, Mercuria EG owned approximately 78 percent of the outstanding shares of Phoenix Global.  (Exhibit G).

59.     At least two Mercuria-affiliated individuals were appointed as directors to the board of Phoenix Global.  The Investment Director of Mercuria EG was appointed as Phoenix Global Director and Chief Executive Officer.  Guillaume Vermersch, Director and the Group Chief Financial Officer of Mercuria Energy Group Limited and Mercuria Energy Trading S.A., was also appointed as a Director of Phoenix Global.  Vermersch was appointed on behalf of two wholly-owned Mercuria EG subsidiaries, Upstream Capital and Mercuria EAM.

60.     Having learned of the Phoenix Transaction after the fact, on August 12, 2017, Mr. Miller sent an email to in-house counsel for Mercuria Energy Trading SA requesting redemption of the JWM Glacco Carried Interest.  In an email response sent August 14, 2017, in-house counsel for Mercuria Energy Trading SA rejected Mr. Miller's request.  A true and correct copy of Mr. Miller's email and Mercuria Energy Trading SA's response is annexed hereto and incorporated by reference herein as Exhibit H.

61.     On September 8, 2017, Mr. Miller, through his counsel, sent a formal demand letter to in-house counsel for Mercuria Energy Trading SA demanding payment of the JWM

Glacco Carried Interest.  On September 22, 2017, Mercuria, through its outside counsel, responded with a rejection of Mr. Miller's demand, contending contrary to the terms of the Separation Agreement that "a Redemption Event relating to the ULA Preferred shares would occur under the Separation Agreement only . . . following the completion of a prospective merger between certain Mercuria-owned entities and Roch S.A."  Counsel also rejected Mr. Miller's demand under the ULA Articles of Association without any reference to the provisions of Article 14 that triggered Mr. Miller's liquidation preference right to redemption.

62.    The Separation Agreement includes another carried interest stemming from Mr. Miller's work in procuring for Mercuria an oil and gas investment in North Dakota.  Despite its initial objections, Mercuria ultimately agreed to pay Mr. Miller an amount owed to him pursuant to that carried interest.

63.    This time, with no alternative given Mercuria's refusal to recognize its obligation to redeem the JWM Carried Interest in connection with the Phoenix Transaction, Mr. Miller is forced to bring this action to enforce his rights to the JWM Carried Interest owed to him under ULA's Articles of Association and the Separation Agreement.

## COUNT I
### (Breach Of Articles Of Association Against ULA)

64.    Mr. Miller repeats and realleges the allegations of Paragraphs 1 through 63 of this Complaint.

65.    Mr. Miller is the owner of 3,200 Class A Preferred Shares of ULA.

66.    Pursuant to Article 4 of ULA's Articles of Association, Mr. Miller is entitled to a preferred liquidation quota "in the event of the voluntary or compulsory dissolution or liquidation of the Company."

67.     ULA's assets consist, directly or indirectly, in shares in the capital of another operating company or companies; namely, Glacco and subsequently PETSA.

68.     Article 14 of ULA's Articles of Association provide that the Company will be dissolved or liquidated if "the Company proceeds to transfer all of its share capital or the majority of the control of the company or operating companies owned directly or indirectly by the Company to any third party, whether by sale, non-monetary contribution, structural modification or admission to list on a secondary official market."

69.     Article 14 also provides that the Company will be dissolved or liquidated if "such operating company or companies owned directly or indirectly by the Company proceed to transfer all or the majority of the assets resulting from its activities."

70.     The Phoenix Global Transaction constituted a dissolution or liquidation under the terms of ULA's Articles of Association.

71.     Mr. Miller was entitled to payment of his Preferred Liquidation Quota due to the Phoenix Global Transaction.

72.     The amount of the Preferred Liquidation Quota as set forth in ULA's Articles of Association is equal to a quota of "seven percent (7%) of the operating profit of the Company, exceeding return of investment rate of ten percent (10%)."

73.     Despite Mr. Miller's demand, ULA failed to pay Mr. Miller's Preferred Liquidation Quota.

74.     As a direct and proximate result of ULA's breach of the ULA Articles of Association, Mr. Miller has suffered damages (and continues to suffer damages) in an amount not less than $32,600,000, plus interest from August 10, 2017.

## COUNT II
### (Breach Of Contract Against METI,
### Mercuria Capital, Mercuria US Holdings, And Mercuria EAM)

75.     Mr. Miller repeats and realleges the allegations of Paragraphs 1 through 74 of this Complaint.

76.     The Separation Agreement constitutes a valid and enforceable contract between Mr. Miller, on the one hand, and METI, Mercuria Capital, Mercuria US Holdings, and Mercuria EAM on the other hand (the "Mercuria Parties").

77.     Pursuant to Section V of the Separation Agreement, redemption of the JWM Glacco Carried Interest is to be governed by the terms of ULA's Articles of Association.

78.     The Phoenix Transaction constitutes a redemption event for the JWM Glacco Carried Interest.

79.     The Mercuria Parties have breached their obligations to Mr. Miller under the terms of the Separation Agreement.  Despite Mr. Miller's demand, the Mercuria Parties have failed and refused to pay Mr. Miller the amount owed to him under the Separation Agreement.

80.     As a direct and proximate result of the Mercuria Parties' breach of the Separation Agreement, Mr. Miller has suffered damages (and continues to suffer damages) in an amount not less than $32,600,000, plus interest from August 10, 2017.

## COUNT III
### (Breach Of The Implied Covenant Of Good Faith And Fair Dealing
### Against METI, Mercuria Capital, Mercuria US Holdings, And Mercuria EAM)

81.     Mr. Miller repeats and realleges the allegations of Paragraphs 1 through 80 of this Complaint.

82.     In the alternative, in the event judgment is not entered in Mr. Miller's favor on Count II for breach of contract, Mr. Miller and the Mercuria Parties are in contract with each

other concerning redemption of the JWM Glacco Carried Interest upon a preferred liquidation event for Mercuria's interest in the Glacco investment.

83.     Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

84.     As a result of the Phoenix Transaction, the Mercuria Parties are obligated pursuant to the Separation Agreement to redeem the JWM Glacco Carried Interest, as set forth above.

85.     The Mercuria Parties have acted in bad faith by rejecting Mr. Miller's demands for payment of the JWM Glacco Carried Interest and failing to pay Mr. Miller the amount owed to him under the Separation Agreement.  By so doing, the Mercuria Parties have wrongfully and intentionally breached the duty of good faith and fair dealing by denying Mr. Miller the benefits to which he is entitled under the Separation Agreement and vitiated his bargained-for-consideration agreed to in connection with his departure from Mercuria.

86.     The Mercuria Parties' breaches of the covenant of good faith and fair dealing have directly and proximately caused Mr. Miller to suffer damages (and continues to suffer damages) in an amount not less than $32,600,000 plus interest from August 10, 2017.

## COUNT IV
### (Breach Of Contract Against Phoenix Global )

87.     Mr. Miller repeats and realleges the allegations of Paragraphs 1 through 86 of this Complaint.

88.     Pursuant to Section V of the Separation Agreement, the Mercuria Parties were obligated to pay the JWM Carried Interest pursuant to the terms of the ULA Articles of Association and thereby committed ULA to redeem the JWM Glacco Carried Interest upon a redemption event.

89.     The Phoenix Transaction constitutes a redemption event for the JWM Glacco Carried Interest.

90.     Phoenix Global acquired and exchanged all of Mercuria's stock in and control of ULA in the Phoenix Global Transaction. Accordingly, Phoenix Global is successor-in-interest to ULA with respect to ULA's commitment under the Separation Agreement. Phoenix Global is therefore obligated to redeem the JWM Glacco Carried Interest pursuant to the Separation Agreement in accordance with the terms of ULA's Articles of Association.

91.     As a direct and proximate result of the Mercuria Parties' breach of the Separation Agreement and ULA's failure to redeem the JWM Carried Interest, Mr. Miller has suffered damages (and continues to suffer damages) in an amount not less than $32,600,000, plus interest from August 10, 2017, and Phoenix Global is now liable for that obligation as ULA's successor-in-interest.

### COUNT V
### (Breach Of The Implied Covenant Of
### Good Faith And Fair Dealing Against Phoenix Global)

92.     Mr. Miller repeats and realleges the allegations of Paragraphs 1 through 91 of this Complaint.

93.     In the alternative, in the event judgment is not entered in Mr. Miller's favor on Count IV for breach of contract, Mr. Miller and the Mercuria Parties are in contract with each other concerning redemption of the JWM Glacco Carried Interest upon a capital event for Mercuria's interest in the Glacco investment. The Separation Agreement includes a commitment by ULA to redeem the JWM Glacco Carried Interest pursuant to the terms of ULA's Articles of Association.

94.    Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

95.    As a result of the Phoenix Transaction, ULA is obligated to redeem the JWM Carried Interest pursuant the terms of the ULA's Articles of Association, as set forth above.

96.    ULA has acted in bad faith by failing to redeem the JWM Carried Interest owed to Mr. Miller pursuant to the Mercuria Parties' obligations under the Separation Agreement. By so doing, ULA has wrongfully and intentionally breached the duty of good faith and fair dealing by denying Mr. Miller the benefits to which he is entitled under the Separation Agreement and vitiated his bargained-for-consideration agreed to in connection with his departure from Mercuria.

97.    ULA's breach of the covenant of good faith and fair dealing has directly and proximately caused Mr. Miller to suffer damages (and continues to suffer damages) in an amount not less than $32,600,000 plus interest from August 10, 2017.

98.    Phoenix Global is successor-in-interest to ULA with respect to ULA's commitment under the Separation Agreement. Accordingly, Phoenix Global is liable for breach of the duty of good faith and fair dealing owed to Mr. Miller, for which he has suffered damages (and continues to suffer damages) in an amount not less than $32,600,000 plus interest from August 10, 2017.

**WHEREFORE**, Plaintiff Jeffrey W. Miller hereby demands judgment as follows:

A.    On Count 1 against Upstream Latinoamerica, S.L. for breach of Articles of Association in the amount of $32,600,000 plus interest;

B.      On Count 2 against Mercuria Energy Trading, Inc., Mercuria Capital Partners Ltd., Mercuria US Asset Holdings, LLC, and Mercuria Energy Asset Management, B.V. for breach of contract in the amount of $32,600,000 plus interest;

C.      On Count 3 against Mercuria Energy Trading, Inc., Mercuria Capital Partners Ltd., Mercuria US Asset Holdings, LLC, and Mercuria Energy Asset Management, B.V. for breach of the implied covenant of good faith and fair dealing in the amount of $ 32,600,000 plus interest;

D.      On Count 4 against Phoenix Global Resources plc for breach of contract in the amount of $32,600,000 plus interest, or, in the alternative, specific performance on the Separation Agreement, whereby Phoenix Global Resources plc will issue shares of Phoenix Global Resources plc to Mr. Miller in a number whose total value equals $32,600,000 plus interest;

E.      On Count 5 against Phoenix Global Resources plc for breach of the implied covenant of good faith and fair dealing in the amount of $32,600,000 plus interest, or, in the alternative, specific performance on the Separation Agreement, whereby Phoenix Global Resources plc will issue shares of Phoenix Global Resources plc to Mr. Miller in a number whose total value equals $32,600,000 plus interest;

F.      Together with such other and further relief that the Court deems to be just, equitable and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Jeffrey W. Miller demands trial by jury in this action of all issues so triable.

Dated: New York, New York
      November 14, 2017

Respectfully submitted,

BAKER & HOSTETLER LLP

By: _____
    John Siegal
    jsiegal@bakerlaw.com
    Andres A. Munoz
    amunoz@bakerlaw.com
    45 Rockefeller Plaza
    New York, NY  10111
    Telephone:      212.589.4245
    Facsimile:      212.589.4201

*Attorneys for Plaintiff Jeffrey W. Miller*

Of Counsel:

    Michael W. Mengis
    mmengis@bakerlaw.com
    Baker Hostetler LLP
    811 Main Street, Suite 1100
    Houston, TX  77002-6111
    Telephone:  713.751.1600
    Facsimile:   713.751.1717